## NEWT. BROOKRESON v. THE STATE.

### No. 6796.    Decided June 7, 1922.

**1.—Murder—Charge of Court—Joint Assault—Defendant's Standpoint.**

Where, upon trial of murder, the court instructed on the law of murder, manslaughter, and self-defense, and it appeared from the record that from defendant's standpoint he was the subject of a threatened attack by both the deceased and his brother, who were acting together, the court in submitting his charge on manslaughter, should not have used terms which would have restricted defendant's right to have the jury determine whether from the

words and acts of each of his adversaries, instead of their combined act, his mind was reduced to a state which rendered him incapable of cool reflection, and having done so, this was reversible error under the facts. Following Stacy v. State, 48 Texas Crim. Rep., 95, and other cases.

### 2.—Same—Remarks by Court—Practice in Trial Court.

Remarks by the court in repremanding the attorney for the defense, in which he referred to the fact that the criminal laws were designed, not only to punish the offenders but to deter others, and that a number of other criminal cases were pending, etc., was improper; nor, should reference have been made to deceased's sisters as orphans.

Appeal from the District Court of Taylor. Tried below before the Honorable W. R. Ely.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*J. M. Wagstaff, W. P. Mahaffey, D. J. Brookreson,* and *J. F. Cunningham, for appellant.*—On question of charge of court on manslaughter, Cotton v. State, 217 S. W. Rep., 161 and cases cited in opinion.

*R. G. Storey,* Assistant Attorney General, *W. J. Cunningham,* District Attorney, and *Stinson, Coombes & Brooks,* for the State.

MORROW, PRESIDING JUDGE.—Conviction is for the offense of murder; punishment fixed at confinement in the penitentiary for a period of twenty-five years.

Appellant shot and killed Oscar Knight, who, together with his brother, Oliver Knight, were tenants upon the farm belonging to the appellant. Appellant directed that some cattle be turned into a field which his tenants were using as a pasture. Being informed that the deceased objected to the cattle in the pasture, appellant turned the stock belonging to the deceased and his brother out of the pasture. They afterwards met on appellant's farm. Appellant was driving through the farm in an automobile in which he had a gun loaded with No. 4 or No. 6 shot. He got out of the car and walked to a point in the field at which the deceased and his brother and some others were engaged in cutting maize. A friendly conversation ensued concerning the maize. Following this, a conversation took place about the pasture, which culminated in a quarrel.

According to the testimony of Oliver Knight, when appellant told them that their stock had been turned out of the field, they remonstrated, claiming the right under their contract to use the field for a pasture. This the appellant denied, and in the same connection said that he would keep the stock where he pleased and would whip the

deceased besides. The witness interposed with a view of preventing trouble. In the meantime, the parties were walking in the direction of appellant's car, which was standing at the turn row. After reaching a point about half way to the car, the appellant ran in the direction of the car. Appellant appeared very much excited upon reaching the car. He got his gun and presented it, claiming that both the deceased and his brother were following him with knives. The witness, Oliver Knight, had a knife in his hand which he had been using in heading maize. Upon appellant making the remarks mentioned, he apologized and closed the knife up and put it in his pocket. The deceased was not armed, though one hand was under his jumper. The witness said that after appellant got to his car, he appeared to have no reason at all, and when the deceased was about fifteen feet away, the appellant shot him, and turned and shot and wounded the witness.

Appellant's testimony was to the effect that prior to the difficulty in which the homicide resulted, the relations between the parties had been friendly. Upon the day of the homicide, he learned that the deceased objected to allowing appellant's cows in the field; that he had an engagement with his wife and several other members of his family to take them to the farm for the purpose of gathering pecans; that he took his gun along with him for the purpose of killing squirrels; that leaving his family in the pecan orchard, he did some work, and in the course of it, saw some boys in a wagon about fifty or one hundred yards away. He went to them and found the deceased and his brother Oliver there. After some friendly conversation touching the disposition of the maize and repairs of fences, the right to the use of the field for pasturage came uder discussion. The appellant contended that the contract did not authorize its use by the tenants. The deceased took the contrary position and insisted that he would continue to put his stock in the field. Hot words and threats ensued.

According to appellant's version, both deceased and his brother had knives open in their hands at the time. Appellant started to pass them, and they followed him. On reaching a point about thirty-five or forty yards from the car, appellant ran to it and got his gun and told the deceased and his brother to stop; that otherwise he would shoot them. He replaced his gun in the car, and deceased said: "Yes, you made a gun play on us, didn't you?" Appellant said: "Yes, you both were trying to jump on me with your knives." At the time Oliver Knight began to take a position at appellant's back, and appellant began to retreat in order to keep Oliver in front of him; that on reaching a point near the middle of the car, Oliver and the deceased, both of whom were nearby, started at him. Appellant turned back and shot the deceased, and then whirled and shot Oliver, who was dodging down behind the car.

From their manner and their tone, and the expressions upon their

faces, the deceased and his brother impressed the appellant that they were excited and angry. He ran because there were two of them; that he was nervous and was afraid of them; that when he first reached his car and got his gun, they stoped. He made no attempt to shoot them, although he had an opportunity to do so had he so desired. The deceased, at the time he was shot, had one hand in his pocket and the other under his jumper. At that moment appellant did not know what he had in his hand; that he backed ten or twelve feet before he shot, the deceased advancing in the meantime. Appellant said he acted under the belief that the two brothers were going to either beat or kill him.

The court instructed on the law of murder, manslaughter, and self-defense. In submitting the case on the issue of manslaughter, the jury were told that if they believed that " at the time of the killing the mind of the defendant was rendered incapable of cool reflection, by reason of any condition or circumstances, or combination of circumstances, or acts and conduct of the deceased, Oscar Knight, or his brother, Oliver Knight, or either of them, calculated to create and did create in the mind of the defendant, either of the emotions known as anger, rage, sudden resentment or terror, at the time of the homicide, rendering the mind of the defendant incapable of cool reflection, then you will find the defendant guilty of manslaughter.'' Against this charge there is directed the criticism that it is defective in that it fails to take into account the effect of the joint assault or action of Oscar and Oliver Knight as an element in arousing the passion of the appellant at the time of the homicide.

From appellant's standpoint, he was the subject of a threatened attack by both the deceased and his brother. As viewed by him, and according to his testimony, they were acting together with the common design to do him injury and were armed with knives. While one approached him, the other sought to get behind him. He had fled from them and they had pursued him; he had put his gun back in the car and they pressed nearer to him. In view of his testimony suggesting these issues, bearing in mind that there is no evidence of previous grudge or ill-will, the defensive theory of manslaughter was an element in appellant's favor. In submitting it, no terms should have been used which would have restricted appellant's rights to have the jury determine whether, from the words and acts of each of his adversaries or from their combined acts, his mind was reduced to a state rendering it incapable of cool reflection. We understand this to be in consonance with the law as declared by this court. See Norris v. State, 42 Texas Crim. Rep., 567; Gant v. State, 55 Texas Crim. Rep., 292; Brown v. State, 54 Texas Crim. Rep., 127; Rogers v. State, 85 Texas Crim. Rep., 338; 212 S. W. Rep., 166; Garcia v. State, 70 Texas Crim. Rep., 488; Stacy v. State, 48 Texas Crim. Rep., 95.

On the former appeal of this case, Presiding Judge Davidson ex-

pressed the view that between the issue of murder and manslaughter, the question of fact was a close one. (See Brookreson v. State, 88 Texas Crim. Rep., 150.) Under different circumstances, the fault of the charge might be regarded as not of sufficient weight to bring about a reversal. It is, however, as we have indicated, inaccurate in that it fails to authorize the jury to take into account an element of the case which, with their attention directed to it, they might have regarded as important and favorable to the appellant; that is, the effect of the evidence that from the appellant's viewpoint, he was the subject of attack from both the deceased and his brother; that they were acting in concert and by their combined efforts were seeking to take him at a disadvantage.

In addition to this, there are other matters in the record which, while taken singly might not be of controlling weight but which, in view of the close issue of fact, are due some consideration in guiding the court to a conclusion. They are not such as will likely occur upon another trial; nor do they require discussion in detail. They had to do with a controversy over certain evidence given upon the former trial touching the presence of a knife at the scene of the homicide after the deceased was killed. In the course of it, a fine was entered against one of the attorneys for the appellant and afterwards remitted. Language was used by the judge in reprimanding the counsel to which exceptions was taken. In argument, reference was made to the fact that the criminal laws were designed not only to punish offenders but to deter others, and the statement was made that there were a number of other similar cases pending.

Proof that the father of deceased was dead was made and his brothers and sisters were referred to as orphans. While individually slight, the tendency of these occurrences was against the appellant.

In view of the evidence, the charge complained of, and the entire record, this court is not willing to approve the verdict.

The judgment is therefore reversed and the cause remanded.

*Reversed and remanded.* ·